Richard W. TRAWEEK, an individual; Traweek Investment Co., Inc., a California corporation; and Traweek Investment Fund Number 10, Ltd., a California limited partnership, Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; San Francisco Department of Public Works; Dianne Feinstein, an individual; Roger Boas, an individual; John L. Molinari, an individual; Harry Britt, an individual; Wendy Nelder, an individual; Louise Renne, an individual; Carol Ruth Silver, an individual; Nancy Walker, an individual; Doris M. Ward, an individual; Willie B. Kennedy, an individual; Evans-Pacific Realty, Inc., a California corporation; Bernstein, Morris, an individual, Defendants.

No. C 83–5640 TEH.

United States District Court,
N.D. California.

April 4, 1984.

Special Master's Findings Dec. 31, 1985.

Order Adopting Special Master's
Findings Dec. 30, 1986.

Alioto & Alioto, Joseph L. Alioto, Joseph M. Alioto, John I. Alioto, Patricia E. Henle, Gary D. Elion, San Francisco, Cal., for plaintiffs; Knickerbocker & Fichter, Richard L. Knickerbocker, Santa Monica, Cal., Pass & Fainsbert, Stephen B. Fainsbert, Torrance, Cal., of counsel.

George Agnost, City Atty., San Francisco, Cal., Blecher & Collins, Maxwell M. Blecher, Howard F. Daniels, Los Angeles, Cal., Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., Robert E. Gooding, Jr., Steven E. Schon, Sarah K. Hofstadter, Therese M. Stewart, Law Offices of Harold S. Dobbs, Godfrey L. Munter, Jr., Robert S. Tandler, Marc Warsowe, San Francisco, Cal., for defendants.

## MEMORANDUM DECISION, ORDER AND ORDER OF REFERENCE TO SPECIAL MASTER

THELTON E. HENDERSON, District Judge.

### I. INTRODUCTION

This antitrust and civil rights action is before the Court on the defendants' motion to dismiss. The suit arises out of the enactment of a San Francisco municipal ordinance which sharply limits the number and kind of apartments which may be converted to condominiums in the city. Under the

ordinance, the plaintiffs,[1] the individual and corporate owners of a large apartment complex—Richard W. Traweek, Traweek Investment Company, Inc., and Traweek Investment Fund No. 10, Ltd.—are barred from converting any portion of their property to condominiums. Challenging the facial validity of the ordinance as well as the conduct and motives of the municipal officials who favored its enactment, the plaintiffs bring suit against the municipality and selected city officials alleging violations of federal antitrust and civil rights laws, and breaches of state tort and contract law. Named as defendants are the City and County of San Francisco, the San Francisco Department of Public Works, Dianne Feinstein, Mayor of San Francisco, Roger Boas, Chief Administrative Officer of San Francisco, John L. Molinari, Harry Britt, Wendy Nelder, Louise Renne, Carol Ruth Silver, Nancy Walker, Doris Ward, and Willie Kennedy, members of the San Francisco Board of Supervisors. The individual defendants are sued in their individual and official capacities.

The Court has carefully considered the well-argued briefs and oral presentations

of counsel. For the reasons stated below, we conclude that (1) the defendant officials' participation in an alleged conspiracy to eliminate the plaintiffs' ability to compete in the market for sale of condominiums supports a colorable claim under the Sherman Act, (2) no viable constitutional claims are presented by the plaintiffs' complaint,[1a] and (3) the individual defendants are shielded from personal liability by the federal and state doctrines of absolute legislative immunity and must be dismissed as parties to this action. Accordingly, the defendants' motion to dismiss will be denied in part and granted in part. Additionally, because of the difficult and sensitive discovery issues raised by the plaintiffs' antitrust claims, a Special Master will be appointed to help formulate and monitor an appropriate discovery scheme. The order of reference is set forth at the conclusion of this decision.

## II. FACTS[2]

The plaintiffs purchased the 720–unit John Muir apartment complex in June 1980. In the spring and summer of 1982, they began to take steps to convert a portion of the property to condominiums. The munic-

1. In the complaint filed in this action, the plaintiffs are referred to collectively as "plaintiff." In this memorandum decision and the following orders, the Court will refer to them in the plural as "plaintiffs."

1a. In considering the plaintiffs' constitutional claims, we take judicial notice of (1) the dates of passage and contents of certain city ordinances, and the contents and legislative history of a proposed city ordinance, see *Newcomb v. Brennan,* 558 F.2d 825, 829 (7th Cir.), cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); see also *Oceanic California, Inc. v. City of San Jose,* 497 F.Supp. 962, 964, 967 n. 8 (N.D.Cal.1980), (2) relevant state and federal laws, *id.,* and (3) the various data collected by the United States Bureau of Census, as set forth in computer print-outs authenticated by the declaration of Maurice Groat, the San Francisco Department of City Planning employee responsible for converting 1980 United States Bureau of Census data from computer tapes to hard copy, see *Skolnick v. Board of Commissioners,* 435 F.2d 361, 363 (7th Cir.1970).

The plaintiffs' objections to our use of the judicially noticeable material in determining the viability of their constitutional challenges are without merit. As the defendants aptly note, "the use of judicially noticeable facts to establish a rational basis for economic legislation is

as old as the rational basis standard itself." *See, e.g., United States v. Carolene Products,* 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938); see also *Oceanic California, Inc. v. City of San Jose, supra,* 497 F.Supp. at 970; 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 200[04] at 200–22 (1982). Moreover, the plaintiffs' hearsay objection to the Groat declaration is meritless. The Groat declaration merely authenticates the computer print-outs which contain the relevant census facts, by attesting to their genuineness and describing the process by which they were derived from the underlying data. The inclusion of this foundational data does not alter the judicially noticeable character of the census data itself. 1 J. Weinstein and M. Berger, *supra,* at ¶ 210[04] at 201–39 ("There are no limitations on methods of providing the judge with information enabling him to decide whether he will take judicial notice.")

Lastly, for the purpose of clarity, we expressly exclude from the record the defendants' references to certain newspaper articles in their opening brief. No such matter has been considered by this Court in ruling on defendants' motion to dismiss. See Fed.R.Civ.P. 12(b).

2. For the purposes of this motion to dismiss, the Court accepts the plaintiffs' allegations as true.

ipal ordinance then in effect, Ordinance No. 337–79 (1979),[3] limited to 1000 the number of conversions permitted in the city annually. Ord. No. 337–79, enacting Subdiv. Code § 1396 (hereafter referred to as the "1979 Ordinance").[4] Property owners interested in reserving a portion of the units allotted for conversion did so on a first come, first serve basis. No property owner was permitted to reserve more than 250 spots annually. Under this system, the plaintiffs successfully registered to submit applications to convert to condominiums 187 John Muir apartments. Although the registration process occurred in 1982, the anticipated development was scheduled for 1983

and thus, in the words of the Ordinance's implementing regulations, the plaintiffs had gained 187 spots on the "1983 Priority List." To reserve these spots, the plaintiffs paid the City $1,870. Thereafter, they spent $400,000 dollars to prepare conversion applications for the 187 units.[5]

In December 1982, the San Francisco Board of Supervisors amended the 1979 Ordinance to restrict the number of conversions permitted annually to 200 and to prohibit all conversion in buildings housing more than six units. Ord. No. 598–82 (1982) (hereafter referred to as the "1983 Ordinance").[6] The 1983 Ordinance, which

3. The 1979 Ordinance was preceded by five years of municipal regulation of condominium conversions in San Francisco. In May 1974, the Board of Supervisors adopted an ordinance opposing a temporary prohibition on conversion of apartment buildings containing twenty-five or more units to condominiums. Ord. No. 251–74 (formally codified as S.F. Admin.Code § 26 A.2; repealed by Ord. No. 163–75). In October 1974 and February 1975, the Board adopted additional ordinances extending the ban on conversions of large buildings for a period totalling six months after the expiration date of the original prohibition. Ord. Nos. 496–74 and 26–75 (formerly codified as S.F. Admin.Code § 26 A.2.1; repealed by Ord. No. 163–75). In April 1975, the Board repealed the provisions of the City's Administrative Code dealing with condominium conversions and simultaneously created the San Francisco Subdivision Code. Ord. No. 163–75. Although the Board did not limit directly the number of units that could be converted annually, it imposed other limitations designed to protect tenants against displacement resulting from conversions. *Id.*, enacting Subdiv. Code §§ 1385(b), (h).

4. The 1979 Ordinance was in effect when the plaintiffs purchased the John Muir. Under its terms, the annual conversion limitation was subject to review and reconsideration annually. Ord. No. 337–79, enacting Subdiv. Code § 1396 ("The Board of Supervisors shall review this section within one year from the date of approval of this ordinance.") The city periodically reviewed and retained 1000 unit ceiling. *See, e.g.,* Ord. No. 86–81, § 1 (1981); Ord. No. 412–82, § 1 (1982).

5. At paragraph 15 of the complaint, the plaintiffs allege:

On or about July 1, 1982, plaintiff was required by the Director of Public Works to submit its application for conversion during the period of June 20, 1983 through July 5, 1983. This required plaintiff to prepare for conversion by submitting a tentative subdivi-

sion map, a '3R inspection report issued by the Bureau of Building Inspection within the past one year,' a preliminary title report, paying the balance of the permit fee, making tenant agreements, and preparing and providing voluminous documentation. In reliance upon the City's express promise to receive and process its application, plaintiff expended at least $400,000 to meet these requirements. (The plaintiffs' complaint is hereafter cited as "Cplt.").

6. In pertinent part, the 1983 Ordinance provides:

Applications for conversion of residential units, whether vacant or occupied, shall not be accepted by the Department of Public Works during the period of January 1, 1983 through December 31, 1985, inclusive, except that a maximum of two hundred (200) units of conversion, as selected yearly by the Department of Public Works from all eligible owner applicants for such conversions, may be approved per year during the aforementioned period for the following categories of buildings:

[B]uildings consisting of four (4) units or less in which one of the units has been occupied continuously by one of the owners of record since on or before January 1, 1982; or,

Buildings consisting of six (6) units or less in which fifty percent (50%) or more of the units have each been occupied continuously by one or more of the applicant owners of record since on or before January 1, 1982; or Community apartments or stock cooperatives as defined in Section 1308 of this Code where seventy-five percent (75%) of the units have been occupied continuously by the owners of record since on or before January 1, 1982.

No application for conversion of a residential building of twenty-five (25) units or more submitted by a 1983 registrant shall be approved by the Department of Public Works to fill the unused portion of the 1,000 unit limitation for the year 1982.

went into effect January 1, 1983, makes some provision for applicants in midstream, like the plaintiffs, but expressly prohibits conversions by any 1983 registrant whose property contains more than twenty-five units. Under the terms of the 1983 Ordinance, the owners of the John Muir are unable to convert to condominiums any portion of their large complex. The 1983 Ordinance expires December 31, 1985.

The plaintiffs filed suit in federal court on August 15, 1983 to challenge the facial validity of the 1983 Ordinance as well as the conduct and motives of the municipal officials who favored its enactment.[7] Liberally construed, the plaintiffs' complaint lists ten causes of action, ranging from violations of the federal antitrust laws, Sherman Act, 15 U.S.C. §§ 1, 2, to a myriad of constitutional challenges under the federal civil rights statutes, 42 U.S.C. §§ 1982, 1985(3), 1986, and pendant state claims for breach of contract and tortious interference with both contract and prospective business advantage. For our purposes on this motion to dismiss, it is sufficient to describe the five major federal claims presented by the complaint. First, it is alleged that the defendants violated the Sherman Act by engaging in a conspiracy with unnamed developers and other private citizens to eliminate the plaintiffs' ability to compete in the market for sale of condominiums through enactment of the 1983 Ordinance and issuance of its precursive administrative directive. 15 U.S.C. §§ 1, 2. Second, four constitutional claims are stated. Plaintiffs aver that the 1983 Ordinance (1) exceeds the defendant municipality's authority under its police powers, (2) constitutes a taking, (3) offends the Equal Protection Clause by irrationally distinguishing between different categories of property and by impinging on the fundamental rights of third parties, and (4) violates the plaintiffs' procedural due process rights.

## A. The Factual Allegations of the Plaintiffs' Complaint

The factual allegations which the plaintiffs make in support of their claims may be summarized as follows:[8] The plaintiffs bought the John Muir for $20 million in June 1980, hoping to convert its 720 moderately priced apartments to affordable condominiums. Constrained by the 1979 Ordinance, the plaintiffs planned to proceed in stages. The first stage commenced successfully when they reserved 187 spots on the 1983 Priority List.

The condominium market which the plaintiffs hoped to enter was allegedly dominated by expensive, luxury condominiums. The plaintiffs aver that they intended to compete in this purportedly slow and saturated market by offering an alternative "affordable, quality condominium."[9] They further allege that unnamed real estate developers and other interested private citizens,[10] alarmed by the threat of the plaintiffs' price competition, "approached" the defendant officials to solicit their aid. During the meetings alleged with some or all of the defendant officials, the unnamed private citizens purportedly convinced the officials that governmental action barring conversion of the John Muir was needed to maintain the high price of condominiums in the city.

As a result of this lobbying, the defendant officials allegedly agreed to stop, by governmental action, the conversion of the John Muir. First, the City's Chief Adminis-

The provisions of this ordinance shall become operative on January 1, 1983.

7. Originally filed in the Central District of California, this action was transferred to this Court on November 21, 1983 on the defendants' motion to transfer venue. 28 U.S.C. § 1404(a).

8. At the hearing on the defendants' motion to dismiss, the plaintiffs made an oral offer of proof in support of their antitrust claims. The offered facts were admitted by stipulation of the parties. In recounting the material factual allegations made by the plaintiffs and in reviewing the sufficiency of those allegations, we make no distinction between the offered facts and those properly plead.

9. Unless otherwise noted, all quotations in this section are from the plaintiffs' complaint.

10. At the hearing, plaintiffs' counsel called this group of unnamed private citizens the "Condominium Committee." Hearing Transcript at 37:7–12 (hereafter cited as "H.Tr.").

trative Officer, defendant Boaz, ordered the Director of the Department of Public Works [11] to stop processing conversion applications. His informal administrative directive was issued in early December 1982, and was promulgated "in anticipation of the passage" of the 1983 Ordinance.[12] Second, on December 20, 1982, the Board of Supervisors passed the 1983 Ordinance. Ord. No. 598–82 (1982).[13] Under the 1983 Ordinance's expansive grandfather clause—which permitted 1983 registrants with buildings containing less than twenty-five units to vie for the remaining spots on the 1982 Priority List [14]—allegedly only the plaintiffs and one other registrant were flatly precluded from converting their registered property.

The other 1983 registrant barred from converting his property allegedly petitioned the Board of Supervisors for relief. Although sympathetic to his situation, members of the Board of Supervisors denied his request, allegedly explaining that his fate was linked to that of the plaintiffs, and that the Board of Supervisors was unwilling to allow the plaintiffs to proceed with the conversion of the John Muir.

Two final incidents are alleged as indicative of the defendants' wrongdoing.[15] First, in early 1983, the plaintiffs were advised by a prominent San Franciscan that their attempt to convert the John Muir was unsuccessful because they "came into town through the wrong channels." H. Tr. at 65:3–10. Second, after the present lawsuit was filed, the plaintiffs received an offer from a local attorney, acting on behalf of an unnamed principal, to buy the John Muir at a price well above its value as rental property. The attorney, who refused to disclose his principal's identity, stated that the price offered reflected the property's worth as condominiums. He explained that although the plaintiffs could not secure approval for conversion, the offeror's unnamed principal could. H. Tr. at 56:11–25, 57:1–2.

The complaint then sums up its allegations by stating that the defendants have combined and conspired with the unnamed private citizens for the purpose of eliminating the plaintiffs' ability to compete in the market for sale of condominiums through the enactment of the 1983 Ordinance and the issuance of the precursive administrative directive. As a result of the concerted

---

**11.** The Department of Public Works administers the condominium conversion regulations in the city.

**12.** In full, the relevant paragraph of the plaintiffs' complaint alleges:
 [T]he City Administrative Officer illegally and informally instruct[ed] the Director of Public Works to arbitrarily deny permission to be placed on the 1982 list to those projects on the 1983 list in excess of twenty-five units. This action was taken in anticipation of the passage of an ordinance which would preclude conversion of the John Muir;....
Cplt. ¶ 17(d).
 We note the sequence of events surrounding the contested administrative action from various judicially noticeable public records. *See Oceanic California, Inc. v. City of San Jose, supra,* 497 F.Supp. at 964, 967 n. 8. On November 15, 1982, the Board of Supervisors passed an ordinance which banned the conversion of residential units to condominiums altogether. On November 29, 1982, the Mayor vetoed the measure and asked the Board of Supervisors to consider an alternative measure. The alternative measure, which was passed by the Board of Supervisors on December 20, 1982, was the 1983 Ordinance.

**13.** The plaintiffs aver that the 1983 Ordinance was enacted in violation of the procedural requirements of Section 2.304 of the City Charter, Cplt. ¶ 22, the California Environmental Quality Act, Cal.Pub.Res.Code §§ 21000 *et seq.* (West 1982), Cplt. ¶ 24, and the Subdivision Map Act, Cal.Gov't Code §§ 66410 *et seq.* (West 1983), Cplt. ¶ 25.

**14.** The grandfather clause in the 1983 Ordinance provides:
 No application for conversion of a residential building of twenty-five or more submitted by a 1983 registrant shall be approved by the Department of Public Works to fill the unused portion of the 1,000 unit limitation for the year 1982.
Ord. No. 598–82, Subdiv. Code § 1396.

**15.** At the hearing on this motion, the plaintiffs forthrightly disclaimed any intent to allege or infer that the conduct complained of was contaminated by fraud or bribery. What they challenge is concerted action to eliminate the plaintiffs' ability to convert the John Muir to condominiums for the purpose of protecting the condominium market from plaintiffs' threatened price competition.

action, the plaintiffs aver that they have been injured and seek declaratory, injunctive and monetary relief, including treble damages. Remaining allegations challenge the facial validity of the 1983 Ordinance under the civil rights statutes and pray for appropriate relief.[16] Also included are allegations supporting the plaintiffs' pendant state claims.

## B. *The Motion to Dismiss*

The defendants move to dismiss the plaintiffs' federal claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[17] They maintain that no federal antitrust liability can stem from their anticompetitive regulation of condominium conversions or the political discussion which preceded it, contending that the challenged activity falls within the exemptions for state action and political advocacy recognized by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943),[18] and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961),[19] respectively. They next urge dismissal of the plaintiffs' constitutional claims for failure to state a legal claim. And lastly, the defendants contend that the individual city officials named as defendants are immune from personal liability under the federal and state doctrines of legislative immunity and therefore must be dismissed as parties to this action.

In considering the sufficiency of the plaintiffs' complaint, we turn first to the antitrust claims. For the reasons stated below, we conclude that the plaintiffs' allegations state an actionable antitrust claim.

## III. DISCUSSION

At this early stage of litigation, the Court is, of course, bound to construe the plaintiffs' complaint liberally. The plaintiffs are entitled to all reasonable inferences which flow from the facts alleged. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The complaint may not be dismissed unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Id.* Viewing the plaintiffs' complaint thusly, we conclude that a colorable antitrust claim is presented.

## A. *The Antitrust Claims*

The plaintiffs allege that the defendant officials have violated the federal antitrust laws by engaging in a conspiracy to eliminate the plaintiffs' ability to compete in the market for sale of condominiums in San Francisco. Sherman Act, 15 U.S.C. §§ 1, 2

---

**16.** The allegations made in support of the plaintiffs' constitutional claims are quoted in the body of this order at notes 23, 27 & 28.

**17.** In the event the defendants prevailed on this motion, they asked that the Court dismiss the plaintiffs' pendant state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**18.** Under the doctrine of state action immunity announced by the Supreme Court in *Parker v. Brown, supra*, and recently re-examined in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), a municipality which acts in furtherance of a clearly articulated and affirmatively expressed state policy to displace competition with regulation is immune from antitrust liability if the challenged municipal restraint is a reasonable or foreseeable consequence of engaging in the authorized activity and thus constitutes the kind of action contemplated by the state legislature. *See also Town of Hallie v. City of Eau Claire*, 700 F.2d 376, 381 (7th Cir.1983), *petition*

*for cert. granted*, 467 U.S. 1240, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1983).

**19.** The *Noerr-Pennington* doctrine, established by the Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, supra*, and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), shields from the Sherman Act anticompetitive advocacy and lobbying activities. The rationale underlying the doctrine is two-pronged. First, a contrary construction of the Sherman Act would "impede the open communication between the polity and its lawmakers which is vital to the functioning of a representative democracy. Second, ... is the threat to the constitutionally protected right of petition...." *City of Lafayette v. Louisiana Power and Light Co.*, 435 U.S. 389, 399, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978) (plurality decision). *See also In re Airport Antitrust Litigation*, 521 F.Supp. 568, 573–588 (N.D.Cal.1981), *aff'd*, 693 F.2d 84 (9th Cir.1982), *cert. denied*, 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983).

(1973). The purpose and effect of the alleged conspiracy, the plaintiffs maintain, was to protect the current market from plaintiffs' threatened price competition in order to maintain the high price of condominiums for the benefit of plaintiffs' competitors. The alleged scheme was purportedly effected by governmental action: the enactment of an anticompetitive ordinance and the issuance of a precursive administrative directive.

In effect, the plaintiffs allege that the defendant officials have wrongly enlisted their legislative and administrative authority to control the price of condominiums in San Francisco, to the detriment of the plaintiffs and for the benefit of plaintiffs' competitors, the defendants' alleged co-conspirators. Their allegations, though threadbare and largely conclusory, state a viable antitrust claim. The Sherman Act was intended to "[prevent] ... restraints to free competition in business and commercial transactions which tend[ ] to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services...." *Apex Hosiery v. Leader,* 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940); *see also In re Airport Antitrust Litigation, supra,* 521 F.Supp. at 573. The conduct to which the plaintiffs attribute their loss—a conspiracy to control the condominium market—is at the heart of the Sherman Act's proscriptions. *Apex Hosiery v. Leader, supra,* 310 U.S. at 493, 60 S.Ct. at 992; *see also Westborough Mall v. City of Cape Girardeau, Mo.,* 693 F.2d 733 (8th Cir.1982).

The fact that the alleged scheme to restrain trade was implemented by arguably valid governmental action [20] does not shield the alleged bad behavior and motives of the defendant officials from review by the antitrust court. As the plurality in *City of Lafayette v. Louisiana Power & Light Co., supra,* stated: "even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its mo-

nopoly in a manner not contemplated by its authorization." 435 U.S. at 417, 98 S.Ct. at 1138.

■ Nor are we convinced that the state action doctrine prevents antitrust review of the allegedly wrongful personal behavior and motives of governmental officials. That doctrine bars antitrust enforcement which seriously threatens the governmental structure of federalism. *City of Lafayette, supra,* 435 U.S. at 400, 98 S.Ct. at 1130. It removes from the proscriptions of the antitrust laws anticompetitive municipal restraints undertaken in furtherance of state mandates to displace competition with regulation. *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *see also Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 381 (7th Cir.1983), *petition for cert. filed,* 52 U.S.L.W. 3070 (U.S. May 11, 1983). Enforcing the antitrust laws against governmental officials—whose personal behavior and motives in undertaking arguably protected governmental action allegedly offend the antitrust laws—infringes on no policy of federalism. *See Westborough Mall v. City of Cape Girardeau, Mo., supra,* 693 F.2d at 746; *Stauffer v. Town of Grand Lake, Colo.,* 1981–1 Trade Cas. (CCH) ¶ 64,029 at 76,326, 76,330 (D.Colo., Oct. 9, 1980); *see also* P. Areeda, *Antitrust Law* ¶¶ 203.3, 203.4 (1982 Supp.). Or, as some courts have analyzed the issue, since it is clear that the State Legislature did not foresee or contemplate that the defendant officials would enlist their authority in furtherance of a scheme to control the price of condominiums in San Francisco, the defendant officials have not engaged in protected state action. *See, e.g., Westborough Mall v. City of Cape Girardeau, Mo., supra,* 693 F.2d at 746.

Similarly, we are disinclined to interpret the *Noerr-Pennington* doctrine to protect governmental officials who allegedly participate in an actionable scheme to restrain trade. The *Noerr-Pennington* doctrine

---

**20.** In denying the defendants' motion to dismiss, we assume, without deciding and for the purposes of argument only, that the 1983 Ordinance furthers a clearly articulated and affirmatively expressed state policy to displace competition with the municipal regulation of condominium conversions and thus constitutes state action. *See infra* pp. 1021–1022.

protects advocacy of, not participation in anticompetitive activities.[21] *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *In re Airport Antitrust Litigation, supra,* 521 F.Supp. at 582–83. Moreover, even assuming that the *Noerr-Pennington* doctrine has sufficient breadth to protect the conduct of governmental officials, the doctrine's sham exception may be available here where the plaintiff alleges that the defendant officials misused their authority to further a scheme to restrain trade. *In re Airport Antitrust Litigation, supra,* 521 F.Supp. at 588.

Accordingly, the defendants' motion to dismiss the plaintiffs' antitrust claims is denied on the ground the plaintiffs' allegations that the defendant officials wrongly enlisted their governmental authority to control the price of condominiums in San Francisco support a colorable antitrust claim. In so ruling, we do not reach the question of whether the 1983 Ordinance itself or its precursive administrative directive reflect an affirmatively expressed and clearly articulated state policy to displace competition with regulation in the condominium market. With today's decision, we only authorize the plaintiffs to go forward with their claim that the municipal action complained of was tainted by improper official behavior and motives.

In proceeding in this manner, we are mindful of the possible chilling effect on the use and workings of governmental machinery posed by inquiry into the plaintiffs' allegations. The tenuousness of the plaintiffs' allegations, coupled with the burden on public officials of responding to them, suggest that this Court must move forward with the utmost care. *See* P. Areeda, *supra,* p. 11, at ¶¶ 203.3, 203.4. Our task is to balance the right of the plaintiffs to pursue their claim without undue impediment, against the sensitive governmental interests necessarily impinged on by their pursuit. The prospect of indiscriminate inquiry into the mental processes of governmental decision-makers troubles us greatly. *Village of Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 268 and n. 18, 97 S.Ct. 555, 565 and n. 18, 50 L.Ed.2d 450 (1977) ("[J]udicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government ... [and are] 'usually to be avoided.' ") (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)). Disruption of the free flow of information between the polity and their municipal legislators which is indispensable to informed public decision-making also causes particular concern. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, supra,* 365 U.S. at 137–38, 81 S.Ct. 529–30.

Nor, in a larger sense, are we unaware of the unfortunate temptation for parties to claim conspiracy whenever governmental decisions go against them. Unrestrained discovery in these actions could seriously disrupt the governmental processes and needlessly harass governmental officials. To guard against such a scenario, and yet to allow the plaintiffs to move forward in this action, this Court will exercise our inherent powers over the administration of justice, *Ex Parte Peterson,* 253 U.S. 300, 312–14, 40 S.Ct. 543, 547–48, 64 L.Ed. 919 (1920); *Schwimmer v. United States,* 232 F.2d 855, 864–65 (8th Cir.1956); *First Iowa Hydro Electric Cooperative v. Iowa-Illinois Gas & Electric Co.,* 245 F.2d 613, 627 (8th Cir.1957), *cert. denied,* 355 U.S. 871, 78 S.Ct. 122, 2 L.Ed.2d 76 (1957), to appoint a Special Master to aid in the formulation and monitoring of a carefully cabined scheme of discovery. Such an appointment will contribute substantially to

**21.** We do not adopt the criticized "co-conspirator exception" to the *Noerr-Pennington* rule. *See Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 229–30 (7th Cir.1975); *In re Airport Antitrust Litigation, supra,* 521 F.Supp. at 590 n. 30. The courts which have discussed the propriety of such an exception have considered whether *private* defendants lose the protection of *Noerr-Pennington* when public officials collaborate with them. The very different question presented by this case is whether the *Noerr-Pennington* doctrine protects the *government officials* who participate in a scheme to restrain trade which was allegedly prompted by arguably protected private advocacy.

the expedition and orderliness of discovery, as well as to the delicate balancing of competing interests in this complex and difficult case. Associate Dean Thomas M. Jorde of the Boalt Hall School of Law, an expert in antitrust and civil procedure, has kindly agreed to aid the Court and counsel by assuming the role of Special Master in this action. Our precise order of reference is set forth at the conclusion of this decision.

**B.** *The Constitutional Claims*

We next consider the sufficiency of the plaintiffs' constitutional claims. It is alleged that the 1983 Ordinance (1) exceeds the defendant municipality's authority under its police powers, (2) constitutes a taking, (3) offends the Equal Protection Clause by irrationally distinguishing between different categories of property and by impinging on the rights of third parties, and (4) was enacted in violation of the plaintiffs' due process rights. For the reasons stated below, we find the plaintiffs' constitutional claims insufficient as a matter of law. Accordingly, as to these claims, the defendants' motion to dismiss will be granted.[22]

1. *The Scope of the Defendant Municipality's Police Powers: Substantive Due Process*

The plaintiffs' substantive due process challenge to the 1983 Ordinance appears to be two-fold.[23] First, they contest the wisdom or rationality of the legislative means used to further the Ordinance's stated housing goals. Second, they insist that they are entitled to conduct discovery to prove that the Ordinance's stated and "concededly legitimate purpose[s]" were feigned. Plaintiffs' Opposition Memorandum at 7:7-8 (hereafter referred to as "Pls'. Opp.Mem."). Merely articulating the plaintiffs' theories reveals their irresolvable weaknesses.

■■■ The power of local governments to legislate for the public welfare is, of course, broad. *Schad v. Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981). Economic regulation, like the ordinance before us, must be sustained against a due process challenge if the regulation rationally furthers any legitimate state objective. *Id.* The Court is not "authorize[d] ... to resolve conflicts in evidence against the legislature's conclusion ..." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979) (quoting *Brotherhood of Locomotive Firemen v. Chicago, Rock Island and Pacific Railroad,* 393 U.S. 129, 138–39, 89 S.Ct. 323, 327–28, 21 L.Ed.2d 289 (1968)); *see also Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) ("Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken.") Moreover, "it is constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); *see also United States Rail-*

---

**22.** The plaintiffs' claims under 42 U.S.C. §§ 1985(3) and 1986 can be addressed and disposed of quickly. Under those sections, conspiracies to violate constitutional rights, 42 U.S.C. § 1985(3), and the negligent failure to prevent such conspiracies, 42 U.S.C. § 1986, are actionable in certain circumstances. In order to state a colorable claim under section 1985(3), one must allege some class-based discriminatory motive on the part of the defendants. *Kaylor v. Field,* 661 F.2d 1177, 1184 (8th Cir.1981). Conspiracies allegedly motivated by "economic or commercial animus," like the one alleged here, are not reached by section 1985(3). *United Brotherhood of Carpenters v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983). Since a cause of action under section

1986 is dependent on a valid claim under section 1985(3), *Kaylor v. Fields, supra,* 661 F.2d at 1184, plaintiffs fail to state actionable claims under either section. Accordingly, the defendants' motion to dismiss as to these claims will be granted.

**23.** At paragraph 58 of the complaint, the plaintiffs allege:

The provisions of Ordinance 598–82 which prevent plaintiffs from converting apartment units to condominiums are on their face unconstitutional, unreasonable, oppressive, and not rationally related to the legitimate purpose of protecting the public health, safety and morals.

*road Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). The district court may simply "hypothesize the motivations of the ... legislature to find a legitimate objective promoted by the provision under attack." *Malmed v. Thornburgh,* 621 F.2d 565, 569 (3rd Cir.1980), *cert. denied,* 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980). As a consequence, inquiry into the subjective motivations of the legislators is unnecessary and usually prohibited. *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 268 and n. 18, 97 S.Ct. at 565 and n. 18; *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) (quoting *McCray v. United States,* 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904)).

▮ Application of these familiar standards quickly reveals that the 1983 Ordinance constitutes an appropriate exercise of the defendant municipality's police powers and thus meets the requirements of the Due Process Clause. First, an undisputed purpose of the challenged regulation is to achieve a balance between owned and rental housing and to preserve rental housing opportunities for low and moderate income residents.[24] That this purpose is within the bounds of the defendant municipality's police powers is conceded by the plaintiffs, *see supra* note 24, and is, in fact, beyond dispute. *See, e.g., Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954); *Block v. Hirsch,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921); *Construction Industry Association v. City of Petaluma,* 522 F.2d 897, 908–09, nn. 16 & 17 (9th Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976); *see also* Note, *The Validity of Ordinances Limiting Condominium Conversion,* 78 Mich.L.Rev. 124, 128–32 (1979).

Second, the means chosen to implement this goal—limitations on the number and kind of apartments which may be converted to condominiums annually—can hardly be characterized as unreasonable. *See infra* pp. 1027–1028 (discussion of the classifications drawn under the 1983 Ordinance). Legislators throughout the country have linked the growth of condominium conversions to the loss of affordable rental housing. *See, e.g.,* Condominium and Cooperative Abuse Relief Act of 1980, Pub.L. No. 399, §§ 602–617, 94 Stat. 1672 (1980) (codified at 15 U.S.C. §§ 3601–3616) (discouraging lending by federally insured lending institutions for condominium conversion

---

**24.** Although the 1983 Ordinance is silent as to its objectives, the legislative findings of its antecedent regulations, set forth below, coupled with the plaintiffs' admission that these same objectives underlie the 1983 Ordinance, are sufficient, for the purposes of our review under the rational basis test, to establish these goals as the objectives of the 1983 Ordinance. *See* Pls.' Opp. Mem. at 7:7–8 ("[T]he limitation on the number of conversions permitted annually bears no substantial relation to the concededly legitimate purpose set forth in the ordinance ... of providing a balance between owned and rented housing and the preservation of the dwindling stock of rental units....")

The following legislative findings support the Board of Supervisor's near decade long regulation of condominium conversion, *see supra* note 3:

[V]acant apartments are in demand and ... major conversions of existing apartment buildings to condominiums may cause severe financial and relocation problems for existing tenants, and in addition, such conversion would reduce the supply of available rental housing in San Francisco.

Ord. No. 251–74.

\* \* \* \* \* \*

Recognizing that, by their unique character and impact on the City's population and housing stock, condominium conversion subdivision differs from other subdivision, ... this Section requires the adoption of special requirements for conversions, the purposes of which are:

1. To preserve a reasonable balance of ownership and rental housing within the City and County of San Francisco by providing for an annual limitation on the number of units which may be converted to condominiums in any year.

2. To promote the meaningful expansion of homeownership opportunities for existing tenants and to prevent the displacement of existing tenants by requiring a high degree of tenant intent to purchase their rental unit as a condition of approval....

Ord. No. 337–79, § 1,

\* \* \* \* \* \*

An increase in condominium conversions coupled with a low vacancy factor and increasing rents has precipitated a rental housing crisis in San Francisco.

Ord. No. 337–79, § 4.

where there are adverse impacts on housing opportunities of low and moderate income, elderly, and handicapped tenants;[25] 1982 Cal.Stats. ch. 1447, § 1 (codified at Gov't Code § 66452.50) (providing for local agencies to enter agreements with subdividers requiring units within new condominium development to be made available as rental housing for ten years); Sunnyvale Municipal Code §§ 19.84.010(4), 19.84.030 (prohibiting conversion unless apartment vacancy rates exceed three per cent). Thus, we are unable to find that it was irrational for the defendants to conclude that a balanced rental and owned housing stock could be furthered by sharply limiting the number of conversions permitted annually and by establishing strict conversion eligibility criteria based on the nature and size of the property. *See supra* note 6 and accompanying text (description and text of the 1983 Ordinance). Accordingly, this Court must conclude that the legislative means employed by the 1983 Ordinance to further its legitimate goals are rationally drawn.

The plaintiffs' claim under the Due Process Clause will therefore be dismissed. Their apparent disagreement with the methods chosen by the Board of Supervisors to achieve a balanced rental and owned housing stock does not support a constitutional claim.[26] *Maher v. Roe*, 432 U.S. 464, 479–480, 97 S.Ct. 2376, 2385, 53 L.Ed.2d 484 (1977) ("[C]ourt[s] do not strike down state laws 'because they may be unwise, improvident, or out of harmony with a particular school of thought.'") (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955). Nor does their suspicion of an illicit purpose provide any basis for constitutional attack under the Due Process Clause. *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) ("It is a familiar principle of constitutional law that ... [a] [c]ourt will not strike down an otherwise constitutional statute on the basis of an alleged illicit motive.") Plaintiffs' remedy for the Ordinance's perceived shortcomings lies elsewhere than in the courts. *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 104 S.Ct. 1058, 1065, 79 L.Ed.2d 299 (1984) ("Disagreement with public policy and disapproval of officials' responsiveness ... is to be registered principally at the polls.") The defendants' motion to dismiss the plaintiffs' substantive due process challenge will therefore be granted.

2. *Taking*

The plaintiffs next contend that the 1983 Ordinance violates the guarantee of the Fifth and Fourteenth Amendments that private property shall not "be taken for public use, without just compensation." The plaintiffs allege that the 1983 Ordinance prevents "any economically viable use of the property" and denies their "reasonable investment expectations."[27] For

---

**25.** In enacting the Condominium and Cooperative Abuse Relief Act of 1980, Congress specifically declared:

"(1) [T]here is a shortage of adequate and affordable housing throughout the Nation, especially for low- and moderate-income and elderly and handicapped persons;

"(2) [T]he number of conversions of rental housing ... is accelerating, which in some communities may restrict [housing] options of low- and moderate-income and elderly and handicapped persons."

15 U.S.C. § 3601(a).

**26.** The plaintiffs argue that the goals of the 1983 Ordinance could be better served if their property were converted to condominiums, noting that San Francisco has the "lowest percentage of owner occupied housing units of any major city in California." Pls.' Opp. Mem. at 51.

**27.** At paragraphs 59 and 60 of the Complaint, the plaintiffs allege:

59. The defendants, by enacting and enforcing these ordinances against the plaintiff under color of law, have taken property rights away from the plaintiff without the payment of just compensation, have effectively deprived the plaintiff of the full use and enjoyment of his property, have prevented the plaintiff from selling individual units of the John Muir as condominiums and thereby denied them any economically viable use of the property and taken from them their reasonable investment expectations.

60. The mere enactment of Ordinance No. 598–82, and its application against the plaintiff constitutes an inverse condemnation of plaintiff's property and a taking of plaintiff's property for public use without the payment of just compensation.

the reasons stated below, we conclude that the plaintiffs' allegations do not support a viable taking claim.

In determining whether a taking has occurred, the Court must focus on the uses permitted under the challenged regulation. *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *American Savings and Loan Ass'n. v. County of Marin*, 653 F.2d 364, 368 (9th Cir.1981); *Oceanic California, Inc. v. City of San Jose, supra*, 497 F.Supp. at 973. If the regulation constitutes a valid exercise of the police powers—as we have concluded the 1983 Ordinance does, *see supra* at pp. 1022–1024,—no taking can be found if there remains a reasonable use of the property. *American Savings and Loan Ass'n v. County of Marin, supra*, 653 F.2d at 368 (interpreting *Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)). Neither allegations of diminished property value, nor charges that the property owner has been denied the opportunity to change to a more profitable use support actionable taking claims. *Haas v. City and County of San Francisco*, 605 F.2d 1117, 1120 (9th Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1979), *reh'g denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980); *Pompa Construction Corp. v. City of Saratoga Springs*, 706 F.2d 418, 420 n. 2, 424, 425 (2nd Cir.1983); *Oceanic California, Inc. v. City of San Jose, supra*, 497 F.Supp. at 974, 976–77.

The plaintiffs argue that the 1983 Ordinance constitutes a taking because (1) it prevents the highest and best use of their land and (2) it interferes with distinct, investment backed expectations. The plaintiffs' theories are discussed in turn below.

First, the plaintiffs' "best use" theory is premised on the proposition that the market value of the John Muir would increase significantly were plaintiffs allowed to convert the property to condominiums. This concept that a taking may be founded on the deprivation of a property's best use has been repeatedly rejected by the Ninth Circuit and other courts as inconsistent with the Supreme Court's seminal decision in *Penn Central Transportation Co. v. New York City. See, e.g., American Savings and Loan Ass'n v. County of Marin, supra*, 653 F.2d at 368 ("A police power regulation is not invalid simply because it prevents the highest and best use of the land."); *Haas v. City and County of San Francisco, supra*, 605 F.2d at 1120; *Pompa Construction Corp. v. City of Saratoga Springs, supra*, 706 F.2d at 420 n. 2, 424, 425; *Deltona Corp. v. United States*, 657 F.2d 1184, 1190–94, 228 Ct.Cl. 476 (1981); *Oceanic California, Inc. v. City of San Jose, supra*, 497 F.Supp. at 975 n. 20. Nonetheless, the plaintiffs press the discredited theory on this Court, insisting that it has been revived by a recent Ninth Circuit decision, *Martino v. Santa Clara Water District*, 703 F.2d 1141 (9th Cir.1983). A careful reading of *Martino* proves otherwise.

In *Martino*, a panel of the Ninth Circuit reversed the district court's summary judgment against the landowner, ruling in part, that a facial taking challenge to a zoning ordinance was ripe despite the landowner's failure to submit a development plan. After holding that the plaintiff's taking claim was justiciable, the *Martino* court instructed the district court to ascertain, on remand, whether the challenged regulation " 'prevent[ed] the best use of the appellants' land ... [or] extinguish[ed] a fundamental attribute of ownership.' " *Id.*, at 1147 (brackets in original) (quoting *Agins v. City of Tiburon, supra*, 447 U.S. at 262, 100 S.Ct. at 2142). The *Martino* court's dictum is drawn from the Supreme Court's decision in *Agins v. City of Tiburon, supra*. As Judge Alfonzo Zirpoli of this Court has explained, the *Agins* "best use" language cannot be taken at face value:

Landowners cannot premise a taking merely upon loss of the "best use" of their property. There is dictum in the *Agins* decision which may conceivably be read to negatively imply a contrary conclusion:

"Although the ordinances limit development, they neither prevent the best use of appellants' land, *see United*

*States v. Causby,* 328 U.S. 256, 262 and n. 7 [66 S.Ct. 1062, 1066 and n. 7, 90 L.Ed. 1206] (1946), nor extinguish a fundamental attribute of ownership, *see Kaiser Aetna v. United States,* 444 U.S. [164] at 179 [100 S.Ct. 383 at 392, 62 L.Ed.2d 332] [ (1979) ]. *Agins v. City of Tiburon, supra,* 447 U.S. at 262 [100 S.Ct. at 2142]."

... The Court's citation elsewhere is the *Agins* opinion to its decision in *Penn Central* indicates the long-standing rule that deprivation of property's "best use" does not of itself mean that a taking has occurred.

*Oceanic California, Inc. v. City of San Jose, supra,* 497 F.Supp. at 975 n. 20. Like Judge Zirpoli, we refuse to read the dictum of the Supreme Court in *Agins,* or that of the Ninth Circuit in *Martino,* as overruling the well-reasoned and long-standing rule that deprivation of a property's "best use" does not result in an unconstitutional taking.

■ Returning to the appropriate taking analysis, the sole question is whether the 1983 Ordinance leaves the plaintiffs with any reasonable use of their property. The obvious answer is that it does. The 1983 Ordinance does not prohibit or affect the continued rental of the John Muir or its resale as rental property. In short, the Ordinance does not extinguish any existing use of the plaintiffs' property and thus does not constitute a taking. *See Oceanic California, Inc. v. City of San Jose, supra,* 497 F.Supp. at 974 (dismissing for failure to state a takings claim on the ground, *inter alia,* that "no existing use of the property is alleged to have been stopped, ... by the acts complained of.")

■ Turning to the plaintiffs' remaining theory, we conclude that the complaint does not allege the kind of *reasonable* investment expectations cognizable as a possible partial basis for a taking claim. First, the plaintiffs bought into a heavily regulated situation and were on notice that the City's condominium conversion regulations were subject to annual review. *See supra* Note 4. Their purchase of property already subject to regulations pertaining to

condominium conversion was therefore necessarily "subject to further legislation upon the same topic." *Veix v. Sixth Ward Building & Loan Association,* 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940); *cf. Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (party's contract expectations are not impaired by change in law where party is operating in heavily regulated industry). Second, the plaintiffs had no "vested right" to complete the planned development under California law. The right to develop a subdivision, such as the conversion of the John Muir apartments, vests under California law only after the developer obtains tentative or final map *approval* and expends substantial sums in reliance on that approval. *El Patio v. Permanent Rent Control Bd.,* 110 Cal.App.3d 915, 927, 168 Cal.Rptr. 276 (1980); *Billings v. California Coastal Commission,* 103 Cal.App.3d 729, 736, 163 Cal.Rptr. 288 (1980) ("final map approval is required in subdivision developments before a right to complete the development vests.") Although the plaintiffs allege that they *submitted* a tentative map, Cplt. ¶ 15, there is no allegation that the map was approved or that the plaintiff *thereafter* spent large sums in reliance on that approval. The pre-approval expenditure of $400,000 supports no cognizable constitutional claim. *See Oceanic California, Inc. v. City of San Jose, supra,* 497 F.Supp. at 974; *see also Avco Community Developers, Inc. v. South Coast Regional Commission,* 17 Cal.3d 785, 800, 132 Cal.Rptr. 386, 553 P.2d 546 (1976), *cert. denied,* 429 U.S. 1083, 97 S.Ct. 1089, 51 L.Ed.2d 529 (1978) ("Land use regulations ... involve the exercise of the state's police power ... and it is settled that the government may not contract away its right to exercise the police power in the future.")

We thus reject the plaintiffs' final contention that a taking claim can be premised on the allegations of wrongful deprivation of investment expectations. No *reasonable* investment expectation was denied by enactment of the 1983 Ordinance. Whatever expectations the plaintiffs may have had about the conversion of the 187 John Muir

apartments under the 1979 Ordinance did not give rise to a binding legislative commitment. Accordingly, the defendants' motion to dismiss the plaintiffs' taking claim will be granted.

### 3. *Equal Protection*

The plaintiffs' equal protection challenge has two facets.[28] The plaintiffs allege that (1) the classifications drawn under the 1983 Ordinance bear no rational relation to the legitimate state interest of achieving a balanced rental and ownership housing stock and preserving rental housing opportunities for low and moderate income residents, and (2) the 1983 Ordinance discriminates against a suspect class and impinges on the fundamental rights of third parties.[29] No colorable claim is stated under either theory.

■ The standards under which the plaintiffs' claim of irrational classifications must be evaluated have been set forth many times by the Supreme Court: the government retains broad discretion to enact laws which affect the economic interests of some groups of citizens differently from others so long as the system or classification used bears some rational relation to legitimate governmental purposes. *San Antonio Independent School District v. Rodriquez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *McGowan v. Maryland,* 366 U.S. 420, 425–27, 81 S.Ct. 1101, 1104–05, 6 L.Ed.2d 393 (1961). If the classification has some reasonable basis, it does not offend the Equal Protection Clause simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 57 L.Ed. 369 (1911). Nor does the Clause prohibit the legislature from attacking a social or economic problem piecemeal, "addressing itself to

the phase of the problem which seems most acute to the legislative mind," *Williamson v. Lee Optical Co., supra,* 348 U.S. at 489, 75 S.Ct. at 465; *see also City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Most important for our evaluation of the plaintiffs' claim is the inveterate constitutional principle that "[a] statutory discrimination will not be set aside if *any* state of facts reasonably may be *conceived* to justify it." *McGowan v. Maryland, supra,* 366 U.S. at 426, 81 S.Ct. at 1105 (emphasis added); *see also Vance v. Bradley,* 440 U.S. 93, 110–11, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979); *Lamb v. Scripps,* 627 F.2d 1015, 1020–21 (9th Cir.1980).

■ The state of facts which justifies the challenged ordinance is readily apparent: a city-wide shortage of adequate low and moderate income rental housing and a large population of potential renters seeking such accommodations. *See* United States Bureau of Census, 1980 (Exhibit A to Groat Declaration) (Table 4, Report 1, STF 1–A and Table 25, Report 4, STF 1–A) (San Francisco has a 2.7 percent vacancy rate in rental housing); *id.* (Tables 1 and 10, Report 1, STF 1–A; Table 36, Report 4, STF 1–A; Tables 68 and 69, Report 6, STF 3–A) (Fifty-seven percent of San Francisco's residents rent. Of that group, a significant portion are elderly and low and moderate income residents.) That the defendants could have reasonably concluded that the classifications, limiting the number of conversions permitted annually and distinguishing eligible from ineligible property on the basis of size and owner residency, rationally further the legitimate stated housing goals is clear.

First, it is not irrational to conclude that reducing the number of condominium conversions permitted annually from 1,000 to 200 will relieve pressure on the city's threatened rental housing stock, *See supra* pp. 1023–1024; *see also* Ord. No. 337–39,

---

**28.** At paragraph 61 of the complaint, the plaintiffs allege:

... The defendants' intentional and malicious enactment of the ordinances was an arbitrary and capricious exercise of police power that deprived the plaintiff of its constitutional

right to due process and to equal protection under the law.

**29.** No specific allegations in the complaint support this theory of liability.

¶ 4 ("[a]n increase in condominium conversion coupled with a low vacancy factor and increasing rents has precipitated a rental housing crisis in San Francisco."); *see also* Condominium and Cooperative Abuse Relief Act of 1980, Pub.L. No. 399, §§ 602–617, 94 Stat. 1672 (1980) (codified at 15 U.S.C. §§ 3601–3616) ("(2) [T]he number of conversions of rental housing ... is accelerating, which in some communities may restrict [housing] options...." 15 U.S.C. § 3601(a)).

Second, the distinction drawn between property with more than six rental units and that with less is surely reasonable: when larger rental buildings are converted, more tenants are displaced, and the already strapped rental stock is further strained. The classification drawn between buildings that are partially owner-occupied and those that are not is supportable for the same reason.

Third, the Ordinance's treatment of the unused portion of the 1982 conversion allotment is far from irrational. By allowing buildings with less than twenty-five units on the 1983 Priority List to proceed with the planned conversions, the defendants have presumably moderated the effect of the 1983 Ordinance on owners in midstream, without sacrificing the Ordinances's essential goal of stemming the large scale withdrawal of affordable rental housing from the market. *Cf.* Ord. No. 251–74 (formerly codified at S.F.Admin. Code ¶ 26A.2; repealed by Ord. No. 163–75) (In May 1974, the Board of Supervisors adopted an ordinance which imposed a temporary prohibition on conversion of apartment buildings containing twenty-five or more units to condominiums.).

■ Despite the facial rationality of the 1983 Ordinance, the plaintiffs insist that they are entitled to conduct discovery to rebut the factual and policy assumptions which underlie the Ordinance.[30] The plaintiffs are mistaken. We repeat: "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland, supra,* 366 U.S. at 426, 81 S.Ct. at 1105. "Court[s] do not strike down state laws 'because they may be unwise, improvident, or out of harmony with a particular school of thought.' " *Maher v. Roe, supra,* 432 U.S. at 479–480, 97 S.Ct. at 2385 (quoting *Williamson v. Lee Optical Co., supra,* 348 U.S. at 488, 75 S.Ct. at 464). Because the classifications drawn by the 1983 Ordinance are rationally drawn, the first portion of the plaintiffs' equal protection challenge must fail.

Plaintiffs next attempt to invoke heightened judicial review of the 1983 Ordinance, by arguing that the Ordinance discriminates against a suspect class and impinges on fundamental rights. The suspect class identified by the plaintiffs includes potential customers who cannot afford to buy condominiums in San Francisco in the current market. The fundamental rights upon which the Ordinance purportedly infringes are (1) the right of the plaintiffs' existing tenants to buy their John Muir apartments, and (2) the right of the plaintiffs' potential customers to travel. Even if we assume that the plaintiffs have standing to represent the interests of these third parties, *Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976), no colorable equal protection claims on their behalf have been stated.

■ Contrary to the plaintiffs' suggestion, financial need does not identify a suspect class for the purposes of equal protection analysis. *Maher v. Roe, supra,* 432 U.S. at 471, 97 S.Ct. at 2381. Nor is

---

**30.** In support of their argument, the plaintiffs rely primarily on *Leary v. United States,* 395 U.S. 6, 38, 52–53, 89 S.Ct. 1532, 1549, 1556–57, 23 L.Ed.2d 57 (1960) and *Chastleton v. Sinclair,* 264 U.S. 543, 547–48, 44 S.Ct. 405, 406, 68 L.Ed. 841 (1924). *Leary* addressed the constitutionality of a criminal statutory presumption affecting the prosecution's burden of proof, and has nothing to do with the test in an equal protection challenge to economic regulation. *Chastleton* is a *Lochner*-era case the validity of which is questionable at best. *See generally* L. Tribe, *American Constitutional Law* ¶¶ 8–1 to 8–7 (1978). Finally, the plaintiffs' reliance on the California case of *American Bank and Trust Co. v. Community Hospital,* 33 Cal.3d 674, 190 Cal.Rptr. 371, 660 P.2d 829 (1983), *reh'g granted,* 34 Cal.3d Minutes 8 (June 15, 1983), is misplaced. California decisions are not controlling on the federal constitutional questions raised here.

there any basis for finding that existing tenants of the John Muir have a fundamental right to purchase their apartments. *Cf. James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). Finally, since the 1983 Ordinance does not affect potential condominium buyers who are non-residents of San Francisco in any way differently than it affects potential customers who are local residents, we see no basis for a right to travel claim. In sum, the plaintiffs fail to state any cognizable claims under either branch of the Equal Protection Clause and the defendants' motion to dismiss these claims will therefore be granted.

### 4. *Procedural Due Process*

██ The plaintiffs lastly contend that they were entitled to notice and a hearing before the enactment of the 1983 Ordinance and the issuance of its precursive administrative directive.[31] As Justice Holmes commented on considering a like claim in *Bi-Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915), "[i]t [is] hard to believe that the proposition was seriously made." As that case, and many others have made clear, the Due Process Clause does not grant to members of the public generally a right to be heard by legislative or administrative bodies making

decisions of policy. *Id.;*[32] *Minnesota State Board for Community Colleges v. Knight, supra,* 104 S.Ct. at 1065;[33] *Yassini v. Crossland,* 618 F.2d 1356, 1363 (9th Cir.1980). Thus, even if we assume, for the purposes of argument, the presence of a protectible property interest,[34] the plaintiffs' procedural due process challenge to the defendants' broadly rule-making and policy-forming conduct fails to state a claim for relief. The defendants' motion to dismiss the plaintiffs' procedural due process claim will therefore be granted.

### C. *Legislative Immunity*

Finally, we address the defendants' claim that the individual defendants are entitled to absolute legislative immunity from the plaintiffs' federal antitrust and pendant state claims.[35] Three questions are presented by the defendants' assertion of legislative immunity: (1) whether the governmental conduct challenged by the plaintiffs' complaint is legislative, (2) whether the doctrine of legislative immunity protects the individual municipal officials from federal antitrust liability, and (3) whether state law doctrines of legislative immunity shield the individual defendants from liability for alleged breaches of state law. For the reasons stated below, we conclude that the federal and state doctrines of legisla-

---

**31.** Because we find the plaintiffs' procedural due process claim fatally flawed, we do not reach the question of whether the claim was sufficiently plead. *But see* Cplt. ¶ 61.

**32.** As Justice Holmes explained:

"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meetings or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Id.,* 239 U.S. at 445, 36 S.Ct. at 142.

**33.** As the Supreme Court has more recently explained:

"Policymaking organs in our system of government have never operated under a con-

stitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted. Legislatures throughout the nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received only from a select group. Executive agencies likewise make policy decisions of widespread application without permitting unrestricted public testimony. Public officials at all levels of government make policy decisions based only on the advice they decide they need and chose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing governmental practices." *Id.,* 104 S.Ct. at 1065.

**34.** *But see supra* pp. 1026–1027.

**35.** Since the defendants do not challenge the viability of plaintiffs' pendant state claims on this motion, we assume, without deciding, that those claims are actionable.

tive immunity shield the individual defendants from liability under the complaint and thus require their dismissal from this action.[36]

### 1. The Federal Doctrine of Legislative Immunity

In *Tenny v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court reaffirmed the "long-standing and wise tradition that legislators are immune from legal responsibility for their intra-legislative statements and activities." *Id.* at 379, 71 S.Ct. at 789 (Black, J., concurring). In recent years, *Tenny* has been interpreted to protect municipal officials against liability stemming from their legislative conduct. *See, e.g., Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1349–50 (9th Cir.1982); *Aitchinson v. Raffiani*, 708 F.2d 96, 98–99 (3rd 1983); *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193–94 (5th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982). The privilege has been held to protect governmental officials from declaratory and injunctive actions, as well as from suits for damages. *See Supreme Court of Va. v. Consumers Union of the United States*, 446 U.S. 719, 732 & n. 10, 100 S.Ct. 1967, 1974 & n. 10, 64 L.Ed.2d 641 (1980).

■ The doctrine of absolute legislative immunity has been construed expansively. Contrary to the plaintiffs' suggestion, the privilege is unaffected by allegations of conspiracy, *Tenny v. Brandhove, supra; Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607 (8th Cir.1980), malice or improper purpose, *Tenny v. Brandhove, supra*, 341 U.S. at 377, 71 S.Ct. at 788, or charges that the legislation itself is substantively or procedurally flawed, *id.* at 379, 71 S.Ct. at 789 (Black, J., concurring). Furthermore, the privilege protects not only the conduct of municipal legislators, but also the acts of municipal administrators and executives "taken in direct assistance of legislative activity." *Aitchison v.*

*Raffiani, supra*, 708 F.2d at 99–100; *see also Gorman Towers, Inc. v. Bogoslavsky, supra*, 626 F.2d at 615–16. Although a well-plead claim of bribery may destroy the immunity, *see Bruce v. Riddle*, 631 F.2d 272, 279 (4th Cir.1980), we have no occasion in this case to consider any such possible exception. *See supra note 15.*

■ To ascertain whether legislative immunity is available, the Court must determine if the conduct complained of is legislative. The test is purely functional. *Lake County Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405 n. 30, 99 S.Ct. 1171, 1179 n. 30, 59 L.Ed.2d 401 (1977). The Supreme Court has instructed the lower courts to examine the plaintiffs' pleadings and determine whether the acts alleged "result[ed] from the nature, and in the execution of" the official's legislative duties. *Tenny v. Brandhove, supra*, 341 U.S. at 374, 71 S.Ct. at 787. If so, the action against the governmental official must be dismissed at the pleading stage. *Tenny v. Brandhove, supra; Gorman Towers, Inc. v. Bogoslavsky, supra*, 626 F.2d at 611.

■ The plaintiffs argue that the conduct complained of consists of "non-legislative administrative acts." Pls.' Opp.Mem. at 71–72. We disagree. Viewing the complaint in the light most favorable to the plaintiffs, the complaint alleges that the defendant members of the Board of Supervisors (1) failed "to remedy the discrimination created by [the 1979 Ordinance] ... such that it would not single out the John Muir despite the strong recommendation and preparation to so remedy by the Director of Public Works ..." Cplt. ¶ 17(b), (2) met with economically self-interested private developers and other interested parties, and conspired with them to eliminate the plaintiffs' ability to compete in the San Francisco condominium market through the enactment of the 1983 Ordinance, (3) injured the plaintiffs by refusing to allow

---

**36.** Legislative immunity shields governmental officials from personal liability for conduct undertaken in their legislative office. A grant of such immunity has no effect on the potential liability of the remaining municipal and county defendants. *See Owen v. City of Independence,* 445 U.S. 622, 650–58, 100 S.Ct. 1398, 1415–19, 63 L.Ed.2d 673 (1980); *see also Community Communications Co. v. City of Boulder, supra,* 455 U.S. 40, 102 S.Ct. 835.

buildings with more than twenty-five units to be converted to condominiums under the 1983 Ordinance, and (4) failed to comply with city and state law in enacting the 1983 Ordinance. The complaint also charges that defendant Boas, the City's Chief Administrative Officer, "illegally" instructed the Department of Public Works not to allow buildings exceeding twenty-five units to be moved from the 1983 to the 1982 Priority List, "in anticipation" of the 1983 Ordinance. Cplt. ¶ 17(d). No specific allegations of wrongful conduct are levied against the defendant mayor.

The challenged activity falls within the scope of the individual defendants' legislative offices. The alleged decision of the defendant members of the Board of Supervisors not to sponsor or enact legislation which would liberalize the provisions of the 1979 Ordinance was a proper exercise of legislative discretion. *Cf. Hernandez v. City of Lafayette, supra,* 643 F.2d at 1193–94. When the defendant members of the Board of Supervisors allegedly met with economically self-interested lobbyists, they also acted in a traditional legislative manner: "[m]eeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider." *Bruce v. Riddle, supra,* 631 F.2d at 280. *See also Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. at 137, 81 S.Ct. at 529. And, it is beyond reasonable dispute that the defendant officials' enactment of the 1983 Ordinance was a legislative act. *Kuzinich v. County of Santa Clara, supra,* 689 F.2d at 1349 ("The enactment of a general zoning ordinance is a legislative act.") The plaintiffs' allegations of improper motive, unfair provisions, and flawed enactment do not alter the legislative nature of the conduct alleged.

■ Moreover, since executive and administrative actions taken "in direct assistance of legislative activity" also constitute legislative conduct, *Aitchinson v. Ruffiani, supra,* 708 F.2d at 99–100 (mayor and borough attorney accorded legislative immunity because their activities were "legislative in character," *id.* at 99), the challenged conduct of the defendant city administrator must also be characterized as legislative. The allegation that the defendant administrator acted "illegally" is insufficient, under the facts of this case, to defeat this characterization.

■ Although no specific allegations of conduct engaged in by the defendant mayor are included in the complaint, construing the complaint liberally and in light of the plaintiffs' offer of proof, we infer that the mayor's alleged liability is based on two kinds of acts: (1) meetings with economically self-interested private developers and other interested persons, and (2) the formal approval of the 1983 Ordinance. Both acts are within the legislative functions of a municipal executive. First, just as meeting with interest groups is part and parcel of a municipal legislator's duties, so too is a mayor entitled and encouraged to meet with interested persons, regardless of their motivations, to receive information regarding proposed legislation. *Cf. Bruce v. Riddle, supra,* 631 F.2d at 280. Second, an executive "acts legislatively" in approving or disapproving bills. *Edwards v. United States,* 286 U.S. 482, 490, 52 S.Ct. 627, 630, 76 L.Ed. 1239 (1932); *Hernandez v. City of Lafayette, supra,* 643 F.2d at 1193–94. We therefore conclude that the conduct allegedly engaged in by the defendant mayor "result[ed] from the nature and in the execution of" her legislative functions and is therefore legislative.

■ Having found the conduct complained of legislative, our next inquiry is whether the doctrine of *Tenny v. Brandhove* protects the individual defendants against the charges of federal antitrust violations. We conclude, for the reasons stated below, that the individual defendants in this action are entitled to absolute legislative immunity from the antitrust violations charged. *See Lochary v. Kayfetz,* 5 Trade Reg.Rep. (1983–2 Trade Cas.) (CCH) ¶ 65,594 (N.D.Cal. July 5, 1983) (members of the Bolinas Community Public Utility Commission entitled to absolute legislative

immunity against claims that a moratorium they imposed on water hook-ups violated the Sherman Act); *Stauffer v. Town of Grand Lake, Colo.*, Civ. No. 80–A–752, slip.op. (D.Colo. Dec. 15, 1980) (members of the Grand Lake Board of Trustee and Planning Commission entitled to absolute quasi-judicial immunity against claims that the defendants' decision to rezone the plaintiff's property violated the Sherman Act).

To determine the reach of federal common law immunities, the Supreme Court has generally accommodated two competing interests. The first is the interest in having governmental officials exercise their judgment free of the fear of burdensome and potentially ruinous personal litigation. The second is the interest in checking improper official conduct and in providing wronged individuals with adequate legal remedies. *See, e.g., Butz v. Economou*, 438 U.S. 478, 501–03, 98 S.Ct. 2894, 2908–09, 57 L.Ed.2d 895 (1978). In the realm of federal antitrust law, a third concern—the presumption against implied exclusions from coverage of the antitrust laws absent potential conflict with "policies of signal importance in our national traditions," *City of Lafayette v. Louisiana Power and Light Co., supra*, 435 U.S. at 398–400, 98 S.Ct. at 1129–30,—should also be weighed in the balance.

The need to insulate municipal decisionmakers from the threat of devastating personal liability is particularly acute in the area of land use and development. The court in *Gorman Towers, Inc. v. Bogoslavsky, supra*, extended absolute legislative immunity to municipal officials who allegedly conspired with private citizens to prevent construction of the plaintiff's proposed development through enactment of an unconstitutional zoning ordinance. The court explained:

> Because municipal legislators are closer to their constituents than either their state or federal counterparts, they are, perhaps, the most vulnerable to and least able to defend lawsuits caused by the passage of legislation. Particularly in the area of land use, where decisions may have an immediate quantifiable impact on both the value and development of property, local legislators should be free to act solely for the public good without the specter of personal liability with the passage of each zoning ordinance.

*Id.*, 626 F.2d at 612 (quoting *Lignon v. Maryland*, 448 F.Supp. 935, 947 (D.Md. 1977)).

Nor will the plaintiffs be denied an effective remedy by extending legislative immunity to the eligible municipal officials. If the individual defendants' legislative conduct is indeed found culpable under the antitrust laws, the defendant municipality will presumably be liable for the official misdeeds of its agents. *See supra* note 36. Moreover, unlawful official conduct is always subject to the traditional "responsibility and the brake of the electoral process." *Lake County Estates, Inc. v. Tahoe Regional Planning Agency, supra*, 440 U.S. at 409, 99 S.Ct. at 1181 (Blackmun, J., dissenting); *Tenny v. Brandhove, supra*, 341 U.S. at 378, 71 S.Ct. at 789.

Finally, despite the traditional presumption against implied exclusions from coverage of the antitrust laws, *City of Lafayette v. Louisiana Power and Light, supra*, 435 U.S. at 398–400, 98 S.Ct. at 1129–30, the Supreme Court has held certain policies of sufficient national importance to override the presumption. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, supra*, 365 U.S. at 137–38, 81 S.Ct. at 529–30, the Court excluded anticompetitive advocacy of private citizens from the ambit of federal antitrust liability, reasoning, *inter alia*, that a contrary construction would "impede the open communication between the polity and its lawmakers which is vital to the functioning of a representative democracy." *City of Lafayette v. Louisiana Power and Light, supra*, 435 U.S. at 399, 98 S.Ct. at 1129 (interpreting *Noerr Motor Freight, supra*, 365 U.S. at 137, 81 S.Ct. at 529). We believe that a similar interest of national importance calls for extending the long-standing and wise doctrine of absolute legislative immunity to the legislative conduct of municipal officials assailed under the antitrust laws. That interest is the need for insulated local

decision-making free from the pressures and fears of burdensome, coercive and potentially ruinous personal liability. It was this interest that the Supreme Court stressed in *Tenny v. Brandhove, supra:* "Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence, but for the public good. One must not expect uncommon courage even in legislators." *Id.,* 341 U.S. at 377, 71 S.Ct. at 788.

Our consideration of these three interests leads us to conclude that absolute legislative immunity must extend to shield eligible municipal officials from antitrust liability. As such, the individual defendants in this action are protected from liability and will be dismissed as parties to these claims.

### 2. *The State Doctrine of Legislative Immunity*

█ The final question raised by defendants' motion to dismiss the individual defendants is whether the state doctrine of legislative immunity protects the individual defendants from liability on the plaintiffs' pendant state claims. Since state law mirrors federal law in this area, *HFH, Ltd. v. Superior Court of Los Angeles,* 15 Cal.3d 508, 519–20, 125 Cal.Rptr. 365, 542 P.2d 237 (1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Hardy v. Vial,* 48 Cal.2d 577, 582, 311 P.2d 494 (1957); *Glickman v. Glasner,* 230 Cal.App.2d 120, 40 Cal.Rptr. 719 (1964); Cal.Gov't Code § 821 (West 1980), we conclude that the individual defendants are immune from liability for their alleged breaches of state law as well.[37] Accordingly, the individual defendants will be dismissed as parties to those claims as well.

## IV. ORDER OF THE COURT

Accordingly, and in sum, IT IS HEREBY ORDERED that:

1. The defendants' motion to dismiss is DENIED as to the antitrust claims set forth in count one of the plaintiffs' complaint.

2. The defendants' motion to dismiss is GRANTED as to the constitutional claims set forth in counts four, five and six of the plaintiffs' complaint for failing to state claims on which relief can be granted. Fed.R.Civ.P. 12(b)(6).

3. The individual defendants, protected from personal liability by the federal and state doctrines of legislative immunity, are DISMISSED as parties to this action.

4. The stay of discovery will remain in effect until it is lifted by order of the Special Master.

## V. ORDER OF REFERENCE

Pursuant to our inherent powers over the administration of justice, IT IS ALSO ORDERED that Dean Thomas M. Jorde, Associate Dean for Academic Affairs and Professor of Law, Boalt Hall School of Law, is HEREBY APPOINTED as Special Master to aid this Court in the pre-trial phase of this litigation. Dean Jorde is eminently qualified to serve the Court in this way, having: (1) received both his Bachelor of Arts (1969) and Doctor of Jurisprudence (1972) from Yale University, where he was a member and editor of the Yale Law Journal, (2) served as a law clerk to Judge Stanley A. Weigel of this Court in 1972–73, and to Justice William J. Brennan of the United States Supreme Court in 1973–74, (3) practiced law, specializing in litigation, from 1974 to 1978, (4) joined the Boalt Hall faculty in 1978, where he has taught courses in antitrust, civil procedure, and legal methods, (5) served as the Special Assistant to the Director of the Bureau of Competition at the Federal Trade Commission, during a year's leave of absence from the Law School in 1981, (6) consulted with a variety of law firms on issues of antitrust and civil procedure, (6) acted as an arbitrator for Alameda and Contra Costa County, (7) served as a specialist in complex litigation on various state and federal commit-

---

**37.** A careful review of the allegations supporting the state law claims of tortious interference with prospective business advantage, Cplt. ¶¶ 33–42, tortious interference with a contractu- al relationship, Cplt. ¶¶ 43–52, and breach of contract, Cplt. ¶¶ 83–93, reveals no additional allegations of conduct other than those already characterized by this Court as legislative.

tees, and (8) written and lectured extensively in the areas of antitrust and civil procedure.[38]

1. Special Master Jorde is empowered to formulate and monitor a scheme of discovery which responds to the concerns of this Court as outlined at pages 12–13 of this memorandum decision. To this end, the Special Master shall enjoy and exercise all powers allowed to Masters under Rule 53 of the Federal Rules of Civil Procedure and all powers necessary and proper to effectuate Rules 26 through 37, and Rule 45(a)–(d) of the Federal Rules of Civil Procedure, subject to this Court's review.

2. In the discovery phase of this action, the Special Master is charged with the following duties:

(a) Initially, the Special Master shall confer with the parties to devise an appropriate scheme of discovery. He shall thereafter establish, by order, the governing scheme for all discovery contemplated by this memorandum decision. To aid in the formulation of this scheme, the Special Master may require the parties to meet and confer, and to brief and argue various issues.

(b) Once an appropriate scheme of discovery is established, and all parties are apprised of it by issuance of the Special Master's order, the Special Master shall schedule all discovery matters. He may determine, in his discretion, whether to be personally present at any discovery proceedings. As monitor of the discovery process, the Special Master shall decide, in the first instance, all questions and disputes relating to discovery pursuant to his powers enumerated in paragraph 1 of this Order of Reference.

3. Any action or ruling made by the Special Master shall be subject to review by this Court on the written application of any party (1) after the order establishing the discovery scheme is issued by the Special Master, (2) after any motion for a protective order is ruled on by the Special Master, (3) at the conclusion of any deposition or document production during which challenged rulings are made, and (4) at any other appropriate time.

4. The party seeking review shall apply to this Court within ten (10) days of the actions described in paragraph 4 of this Order of Reference. Such time may be enlarged for good cause by application to the Special Master.

(a) The party seeking review shall, at its own expense, provide the Court with a transcript of the proceedings at issue, if available, together with a concise statement of the issues and a memorandum of law. Absent leave of court, the memorandum of law shall not exceed fifteen (15) pages.

(b) The opposing party shall submit a responsive memorandum within five (5) days of the request for review. Absent leave of court, the responsive memorandum shall not exceed fifteen (15) pages.

---

**38.** Below is a sampling of Dean Jorde's publications and presentations:

Jorde (with Harris), "Antitrust Market Definition: An Integrated Approach," 72 *California Law Review* 1–66 (1984).

Jorde (with Harris), "Market Definition in the New Merger Guidelines: Implications for Antitrust Enforcement," 71 *California Law Review* 464–96 (1983).

Jorde, "The Seventh Amendment Right to Jury Trial of Antitrust Issues," 69 *California Law Review* 1–79 (1981); reprinted in 1 *National Law Review Reporter* 2345–2423.

"Antitrust Enforcement Issues and Legal Standards for Mergers and Acquisitions," at School of Business' Program in Public Finance Conference, Monterey, California (March, 1983).

"The New Merger Guidelines: Market Definition Issues," Association of American Law Schools, Antitrust Section, Cincinnati, Ohio (January, 1983).

"Developments in Franchise and Tie-in Law," California Continuing Education of the Bar Program (May, 1982)

Moderator, Panel Discussion on Complex Litigation Issues, Association of American Law Schools, Civil Procedure Section, Philadelphia, Pennsylvania (January, 1981).

"Antitrust Issues of the 1980's," Executive Management Program in Residence, University of California School of Business (October, 1980).

"Trends in Antitrust Law, Advanced Management Program in Business and Public Affairs, University of California School of Business (June, 1980).

(c) On any matter brought to the Court for review, the Special Master shall furnish the Court with a statement of the problem and the reasons for his action. Such statement shall be filed with the Court and served on the parties within twenty (20) days of the request for review.

5. The Special Master shall make periodic written reports to the Court at intervals of not less than thirty (30) days regarding the progress of the matters committed to him under this Order.

6. The Special Master shall be compensated at the rate of $125.00 per hour to be borne equally by the plaintiffs and defendants. His interim compensation shall be fixed by the Court, either on the written stipulation of the parties and the Special Master or on the motion of the Special Master. Applications for interim compensation may be made after the initial discovery order is issued, *see supra* ¶ 2, at the conclusion of any deposition or inspection of documents, or after a ruling by the Special Master on a discovery motion.

7. Final compensation due the Special Master shall be fixed by the Court in the same manner, *see supra* ¶ 6.

8. The parties shall pay the Special Master within five (5) days of any order fixing compensation issued by this Court.

9. A copy of all papers hereafter filed in this action shall be furnished to the Special Master by personal delivery or by mail to his office address, Boalt Hall School of Law, Berkeley, California 94720, no later than the date of the filing of these papers with the Court. A copy of any application for review and of any papers in support of or in opposition thereto shall be hand delivered to the Special Master.

10. Within fifteen (15) days of the date of this Order the Special Master shall contact counsel for the parties in this action to begin the proceedings contemplated under this Order.

11. This Order may be corrected or amended as the Court finds appropriate.

IT IS SO ORDERED.

## ORDER GRANTING DEFENDANTS' MOTION TO ADOPT SPECIAL MASTER'S FINDINGS

This matter comes before the Court on defendants' motion to adopt special master's findings pursuant to Rule 53(e) and Rule 6(d) of the Federal Rules of Civil Procedure. Having carefully reviewed the record presented, good cause appearing, and for the reasons stated below, the Court hereby grants defendants' motion to adopt special master's findings and hereby adopts the Memorandum of Decision filed by Special Master Thomas M. Jorde on December 31, 1985.

On April 4, 1984, the Court denied the motion by defendants City and County of San Francisco (hereinafter "defendants" or "City") to dismiss antitrust claims filed by Richard W. Traweek, Traweek Investment Co., Inc., and Traweek Investment Fund No. 10, Ltd. (hereinafter "plaintiffs" or "Traweek"). *See* Memorandum Decision, April 4, 1984 (hereinafter "April 4 Order"). Also on April 4, the Court, pursuant to its inherent powers over administration of justice, ordered Thomas M. Jorde appointed Special Master under Federal Rule of Civil Procedure 53 to assist the Court in the pretrial phase of what the Court found to be a "complex and difficult" case.[1] Specifically, Jorde was ordered to formulate and monitor an appropriate discovery scheme for the case. The Court appointed the Special Master "because of the difficult and sensitive discovery issues raised by the plaintiff's antitrust claims," with the expectation that the appointment would "contribute substantially to the expedition and orderliness of discovery, as well as to the delicate balancing of competing interests in

---

**1.** The Court notes that the state of the antitrust law relevant to this matter was considerably more complicated at the time of reference than it is now. The two key cases, *Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir.1985), addressing the issue of bad motives, and *Town of Hallie v.* *City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), involving the state action exemption, were decided after the date of the order of reference. *Llewellyn* was decided on July 8, 1985 and *Town of Hallie* on March 27, 1985.

this complex and difficult case." April 4 Order at 3, 13.

Subsequent to his appointment, Special Master Jorde implemented a "staged" discovery procedure under which plaintiffs were allowed to take the depositions of a number of city employees and to obtain a large number of documents. After this discovery, on October 25, 1984, defendants moved for summary judgment contending that plaintiffs had not found evidence through discovery to support the elements necessary to establish an antitrust violation.

On November 7, 1984, the Court ordered defendants' summary judgment motion referred to the special master "[b]ecause of the extensive factual record" to be considered with the motion. The Court's November 7 Order directed the Special Master to set forth "findings and recommendations" with respect to defendants' summary judgment motion and plaintiffs' motion to compel production of certain documents and the deposition of certain San Francisco city officials.

On April 25, the Special Master filed a 45 page opinion in which he deferred the City's summary judgment motion concerning alleged violations of the Sherman Act (15 U.S.C. 1) until further limited and specific discovery by plaintiffs could be completed. *See* Memorandum of Opinion and Order, April 26, 1985 (hereinafter "April 26 Order"). The Special Master also deferred defendants' alternative ground for summary judgment, the Local Government Act of 1984. April 26 Order at 44.

Before plaintiffs had completed the additional discovery permitted by the April 26 Order, defendants asked the Special Master to stay discovery so that defendants could renew their summary judgment motion based upon a case then recently decided by

the Ninth Circuit Court of Appeals, *Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir. 1985). The Special Master granted defendants' request for a stay in discovery proceedings and defendants renewed their motion for summary judgment.

On December 31, 1985, the Special Master recommended that the City's motion for summary judgment be granted, finding that *Llewellyn* and other cases decided by the Ninth Circuit and the Supreme Court after the Court's April 4, 1984 Order were dispositive of plaintiff's Sherman Act claim. Memorandum of Decision, December 31, 1985 (hereinafter December 31 Order). The Special Master found it unnecessary, however, to reach the question of whether Section 3(a) of the Local Government Act of 1984, as defendants' contended, was retroactively applicable to the case.

The Court's decision regarding disposition of the Special Master's decision is governed by Rule 53(e) of the Federal Rules of Civil Procedure. Defendants' summary judgment motion is in the nature of a "non-jury action" because the motion comes before the Court without a jury. Therefore, subsection (2) of Rule 53(e) is applicable to this case. Under subsection (2), "[t]he Court after hearing may adopt the report or may modify it or may reject it in whole or in part...." *See United States v. Hilliard*, 412 F.2d 174, 178 (8th Cir.1969); 5A J. Moore & J.Lucas, Moore's Federal Practice, § 53.13[2] (2d ed. 1985).[2]

Having conducted a hearing on defendants' Motion to Adopt Special Master's Findings, and having reviewed the law relevant to the claims brought in this case, the Court agrees with the reasoning of the Special Master in his Memorandum of Decision of December 31, 1985 and hereby adopts the Memorandum as dispositive of this case.

**2.** The Court is aware of *dicta* from the Seventh Circuit suggesting that the trial judge should conduct independent analysis in deciding whether to adopt a special master's report granting summary judgment. *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 712 (7th Cir.1984). This Court has conducted such an independent analysis and finds itself in complete agreement with Special Master Jorde's

well reasoned Memorandum of Decision. In so doing, the Court notes that Dr. Jorde Assistant Dean at the University of California Boalt Hall School of Law, is a nationally acknowledged expert in the areas of antitrust and civil procedure, and it was due to his expertise in these two areas of law that he was selected for this case.

From the beginning, plaintiffs have argued that certain City officials and private developers conspired in bad faith to eliminate or limit the plaintiff's ability to compete in the condominium housing market in San Francisco. The purpose of referring this case to a special master was to afford plaintiffs an orderly process by which they could conduct discovery on their claims regarding bad motives of City officials while protecting the important interests of governmental decision makers. Indeed, in the April 4 Order, this Court stated that "[o]ur task is to balance the right of the plaintiffs to pursue their claim without undue impediment, against the sensitive governmental interests necessarily impinged on by their pursuit."

 However, even if plaintiffs have uncovered or were to uncover evidence of bad motives, this Court finds such evidence irrelevant because as a matter of law the state action exemption still applies even when there are bad faith motivations of public officials. *See Llewellyn v. Crothers*, 765 F.2d 769 (9th Cir.1985). The critical question then is whether the state action exemption applies. This Court finds that the City's 1983 Ordinance regulating condominium conversion is entitled to the protection of the state action exemption under antitrust laws because it is the type of regulation displacing competition that was fully authorized by the State under the California Subdivision Map Act. Cal.Gov't Code §§ 66411, 66421, 66426, 66473. *See Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *LaSalle Nat'l Bank of Chicago v. County of DuPage*, 777 F.2d 377 (7th Cir. 1985).

Accordingly, IT IS HEREBY ORDERED that defendants' motion to adopt special master's findings is GRANTED and defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

### SPECIAL MASTER'S FINDINGS

#### I. *Introduction.*

On April 4, 1984, the Court denied the motion by defendants City and County of San Francisco ("defendants" or "City") to dismiss antitrust claims filed by Richard W. Traweek, Traweek Investment Co., Inc., and Traweek Investment Fund No. 10, Ltd. ("plaintiffs" or "Traweek"). The Court held that the complaint stated a colorable antitrust claim because it alleged that city officials had conspired with private real estate developers and other private citizens to eliminate plaintiffs from the condominium market in San Francisco, in order to maintain higher condominium prices for the benefit of plaintiffs' competitors. The Court believed that, even if the requirements of the "state action" doctrine were met, "The fact that the alleged scheme to restrain trade was implemented by arguably valid governmental action does not shield the alleged bad behavior and motives of the defendant officials from review by the antitrust court." (Opinion at 10 and note 20; footnote omitted.)

Subsequently, defendants moved for summary judgment, arguing that plaintiffs had failed to prove agreement as required by Section One of the Sherman Act, 15 U.S.C. 1. The Special Master deferred ruling on defendants' motion, in order to provide plaintiffs the opportunity to seek additional evidence from city officials concerning the existence of a conspiracy or agreement to restrain trade in violation of the antitrust laws. A ruling on defendants' alternative ground for summary judgment, the Local Government Act of 1984, was also deferred. (Memorandum of April 25, 1985.)

The parties worked diligently toward securing additional discovery. However, on September 5, 1985, at defendants' request, the Special Master stayed further discovery in order to provide defendants the opportunity to renew their motion for summary judgment, based upon the recently decided Ninth Circuit case of *Llewellyn v. Crothers*, 765 F.2d 769 (1985).

The parties have now fully briefed and argued defendants' renewed motion for summary judgment. For the reasons stated below, defendants' motion is granted.

## II. The State Action Exemption.

When the Court wrote its Opinion of April 4, 1984, denying defendants' motion to dismiss plaintiffs' antitrust allegations, the law was unclear concerning the scope of the state action exemption as applied to the actions of municipalities. *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) and *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) had held that a municipality could be entitled to the protection of state action exemption from the antitrust laws if it acted pursuant to a clearly articulated and affirmatively expressed state policy. But the Supreme Court had not given guidance concerning how specifically a state must articulate a policy to permit a municipality to displace competition. Moreover, the Supreme Court had left open the question whether the state action exemption also required "active state supervision" of anticompetitive municipal activity, a requirement applied to the activities of individuals. *See California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Finally, it was not clear whether municipal activities meeting the criteria for state action exemption might nevertheless lose that protection if public officials acted from bad motives. *See Westborough Mall v. City of Cape Girardeau, Mo.*, 693 F.2d 733 (8th Cir. 1982).

The Court's April 4, 1984 Opinion did not reach the question whether the defendants' enactment of the 1983 Ordinance (Ord. No. 589–82), which had the effect of barring plaintiffs from converting the John Muir apartments to condominiums, met the requirements for state action exemption. Instead, the Court assumed that the legislation fell within the state action exemption, but held that defendants might nevertheless be liable for violating the antitrust laws if plaintiffs were able to prove that defendants acted with bad motives to advance the interests of plaintiffs' competitor developers. The Special Master, adopting the Court's legal analysis, developed a staged discovery procedure that first required plaintiffs to focus upon the question of an agreement or a conspiracy to violate the antitrust laws.

Subsequent to the entry of these orders, a number of important and pertinent clarifications have been made by the Supreme Court and the Ninth Circuit Court of Appeals concerning the scope of the state action exemption. These are discussed below in the context of defendants' renewed motion for summary judgment.

*A. Bad faith motivation does not play a role in state action exemption from the antitrust laws.*

The narrow window that the Court left open in this case for the plaintiffs to prove antitrust liability through defendants' bad behavior or motives appears now to have been closed by the Ninth Circuit in *Llewellyn*. Plaintiffs in that case were licensed chiropractors in the State of Oregon who alleged that officials of the Oregon Workers' Compensation Department ("OWCD") and the State Accident Insurance Fund Corporation ("SAIFC") (treated by the court as a private party) conspired to injure chiropractors by setting unfavorable fee guidelines and maximum fee schedules. The Ninth Circuit affirmed the district court's grant of summary judgment in favor of defendants, holding that the action by OWCD and SAIFC implemented a clearly articulated and actively supervised policy of the State of Oregon to subordinate free competition among health care providers to the need of the state to reduce costs in the area of worker's compensation health care, and thus was entitled to state action exemption from the antitrust laws.

On appeal, the chiropractors argued that, notwithstanding that the requirements of state action exemption were met, the exemption "should be unavailable because of the alleged bad faith motivation of [the Medical Director of OWCD]." (At 774) Specifically, the district court had found that "[t]here is evidence that neither [the Medical Director of OWCD nor SAIFC] liked chiropractors as a group and that they may have actively sought ways to 'get the chiropractors.'" *Llewellyn v. Croth-*

*ers,* No. 81–6462 FR, slip op. at 22 (D.Or. Apr. 20, 1983) [Available on WESTLAW–DCT database]. The Ninth Circuit, however, rejected a "bad faith motivation" limitation to the applicability of the state action doctrine:

> The availability of *Parker* immunity, however, does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.
>
> In this case, despite the possibility of improper motivation on the part of [the Medical Director of OWCD], no evidence indicates that his actions exceeded the scope of his authority. His actions were taken pursuant to an express state policy and were of a kind contemplated by the statutory scheme.... In the context of determining antitrust immunity, further inquiry into the subjective motivations of the Oregon officials is unwarranted. (At 774)

In reaching this conclusion, the Ninth Circuit quoted with approval Areeda, "Antitrust Immunity for "State Action" After Lafayette," 95 *Harv.L.Rev.* 435, 449–50 (1981):

> State laws intended to displace the antitrust laws may delegate to public agencies or officials the power to act, decide, or regulate in order to achieve anticompetitive results. Of course, state law "authorizes" only agency decisions that

are substantively and procedurally correct. Errors of fact, law or judgment by the agency are not "authorized," and state tribunals will normally reverse erroneous acts or decisions. If the antitrust court demands unqualified "authority" in this sense, it will inevitably become the standard reviewer of governmental agencies whenever it is alleged that the agency, though possessing the power to engage in the challenged conduct, has exercised its power erroneously.

Moreover, allegations of conspiracy between government officials and private parties "do not negate the antitrust exemptions," *Llewellyn* at 775, or make bad motives relevant. Again, quoting from Areeda, *supra,* at 452, the Court notes:

> Vague and unsupported conspiracy allegations deserve very little respect from the antitrust court, given (1) the temptation for a party before a governmental body to claim an antitrust conspiracy whenever the decision is disappointing, (2) the modest likelihood that bad faith or corruption can be proved, and (3) the potential chilling effect antitrust proceedings might have on the operations of government. (*Llewellyn* at 775.)

In view of the Ninth Circuit's generous concern for federalism and state sovereignty, the alleged conspiracy and bad faith motivations of the defendants in this case, even if they could be proved by plaintiffs, are irrelevant to a determination of state action exemption for the City's enactment of the 1983 Ordinance. Rather, the sole relevant inquiry is whether the defendants' actions, when measured by objective state action standards, were "of a kind" contemplated by the state's delegation of authority to the City.[1] If, indeed, the 1983 Ordi-

---

1. There is no support in logic or the language of *Llewellyn* for plaintiffs' argument (at p. 10 note 3 of Plfts' Supp. Memo in Opp. to Summary Judgment) that *Llewellyn's* standards concerning the irrelevance of bad faith motivation apply only to delegations of authority to state agencies and not to municipalities. *Llewellyn* applied to private parties, *i.e.* SAIFC, as well as to OWCD, the state agency. *Llewellyn* at 774–75. When the objective standards of state action exemption are met (*see* the discussion of

standards in II.B., *infra* ), a municipality's actions are entitled to exemption from the antitrust laws because it acts on behalf of, and under delegation from, the state sovereign. Certainly a municipality should receive no less protection than a private party in view of the Supreme Court's observation: "We may presume, absent a showing to the contrary, that the municipality acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on his or its own behalf."

nance is the type of regulatory legislation authorized by the state regarding condominium conversion, then state action exemption exists, without regard to the City's motivation for passing the ordinance or any agreements City officials might have had with plaintiffs' competitors concerning passage of the ordinance.

Thus, for purposes of deciding defendants' summary judgment motion, it is no longer possible merely to assume that the City's enactment of the 1983 Ordinance satisfies the objective requirements for state action exemption. Since this is now the only relevant question, it must now be resolved.

*B. Action by a municipality is entitled to state action exemption if it is a type contemplated by the state's delegation of authority which would foreseeably result in anticompetitive effects.*

*1. The objective legal standards for state action exemption for municipal activities.*

The requirements for state action exemption for municipal activities were clarified considerably by the Supreme Court in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985). Prior to *Hallie,* the Court had held that a municipality must act pursuant to a "clearly articulated and affirmatively expressed ... state policy." *City of Lafayette, supra,* 435 U.S. at 410, 98 S.Ct. at 1135. That language raised questions concerning the required degree of specificity in the state's delegation of authority to a municipality. In *City of Boulder, supra,* the Court made clear that broadly delegated general authority in the form of a Home Rule Constitutional Amendment did not meet the "clear articulation" requirement, but the Court's opinion did little to establish the minimum requirements of specificity that state authorization must meet. *Hallie* remedied the problem by indicating that it is enough if the state delegation of authority "clearly contemplate that a city may engage in anticompetitive conduct ... [that would] foreseeable result [or] logical-

ly would result from this broad authority to regulate." *Id.,* 105 S.Ct. at 1718. The state need not compel or expect a municipality to engage in anticompetitive conduct. The Court recognized that such specificity would "embod[y] an unrealistic view of how legislatures work and of how statutes are written. No legislature can be expected to catalog all of the anticipated effects of a statute.... Furthermore, requiring such explicit authorization by the State might have deleterious and unnecessary consequences." *Id.* at 1719. *Hallie* further clarified the law by holding that when a state delegates authority to a municipality it need not actively supervise the delegation, a requirement that had been applied to delegations to private parties. *Id.* at 1720.

In articulating these standards, the Supreme Court implicitly affirmed the Ninth Circuit's approach to state action exemption for municipal activities. In a trilogy of cases decided before *Hallie,* the Ninth Circuit found state action exemption for municipal activities involving regulation of cable television, *Catalina Cablevision Associates v. City of Tucson,* 745 F.2d 1266 (9th Cir.1984), local ambulance service, *Spring Ambulance Service, Inc. v. City of Rancho Mirage,* 745 F.2d 1270 (9th Cir.1984), and solid waste collection, *Tom Hudson & Associates, Inc. v. City of Chula Vista,* 746 F.2d 1370 (9th Cir.1984), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985). In each case, the Court found that the state legislature had affirmatively dealt with the challenged subject area and had contemplated that the kind of actions alleged to be anticompetitive were a necessary or reasonable consequence of engaging in the authorized behavior.

More recently, in *Grason Electric Co. v. Sacramento Municipal Utility District,* 770 F.2d 833 (9th Cir.1985), the Ninth Circuit ordered that summary judgment be entered in favor of defendant after finding, as a matter of law, that California's broad grant of authority to municipal utility districts "evidence[d] a clearly articulated and affirmatively expressed state policy to dis-

*Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 45, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985).

place competition with regulation in the area of electrical power and light." *Id.* at 838. Applying the legal standards articulated in *Hallie*, the Court held that state action exemption was applicable to the utility district's activities, because "it is apparent 'that anticompetitive effects logically would result from this broad authority to regulate.' " *Id.* at 838.

*2. Analysis of the defendants' activities and the state's delegation of authority to regulate condominium conversion.*

Applying *Hallie* and these Ninth Circuit cases to activities of the city in this case, it is clear that the enactment of the 1983 Ordinance, regulating condominium conversion in the City and County of San Francisco, was a type of regulation displacing competition that was fully authorized by the state. Review of the state's delegation of authority to zone property and regulate condominium conversion establishes that the anticompetitive effects of the city's activities were foreseeable and flow logically from that delegation of authority. The city's activities thus meet the objective requirements of the "clear articulation" test and therefore are entitled to the protection of state action exemption from prosecution under the antitrust laws.

The California Subdivision Map Act governs condominium conversions and requires municipalities to regulate this subdivision of real property. Gov't Code Secs. 66411, 66421, 66426, 66473. The Map Act directs municipalities to adopt ordinances addressing "the housing needs of the region," Gov't Code Sec. 66412.2, and the Planning and Zoning Law requires municipalities to adopt a general plan that addresses "housing for all income levels, including rental housing," Gov't Code Secs. 65300, 65302(c), 65583(a)(1), (c). The California Attorney General has found that these statutory provisions empowerer municipalities to prohibit condominium conversion to protect the rental housing stock. 58 Op. Att'y Gen. 41 (1975). *See also Griffin Development Co. v. City of Oxnard,* 39 Cal.3d 256, 217 Cal. Rptr. 1, 703 P.2d 339 (1985).

This comprehensive statutory scheme clearly authorized municipalities to regu-

late condominium conversion and displace free market competition. As the Seventh Circuit Court of Appeals recently noted, "By definition zoning is a approach to land use which engrafts upon laissez-faire capitalism a regulatory scheme controlled by political institutions." *LaSalle Nat'l Bank of Chicago v. County of DuPage,* 777 F.2d 377 (7th Cir.1985), *reported in* 49 *ATRR* 982, 983 (Dec. 5, 1985).

Pursuant to the state's delegation of authority to regulate condominium conversions, and in order to maximize the housing opportunities and choices of its residents, the Housing Element of San Francisco's General Plan allows conversion of existing rental apartment buildings into condominium or stock cooperatives only when the proposed conversions meet specified criteria. City and County of San Francisco, Master Plan—The Housing Element: III. Implementation Programs and Activities (Dec. 1980, rev'd Sept. 1981) Policy 4, Program 42, at 19. The 1983 Ordinance implemented this policy and limited condominium conversions to 200 units annually in buildings with no more than six units. In addition, the 1983 Ordinance prohibited those properties on the 1983 Priority List that contained more than 25 units from moving up to occupy available conversion slots on the 1982 priority list.

Without question the 1983 Ordinance had the effect of barring plaintiffs from entering and competing in San Francisco's condominium market. But the anticompetitive effects of such condominium regulation, including price stabilization and quantity limitations, were plainly foreseeable and resulted logically from the state's authorizing statutory scheme. The authority for condominium regulation was clearly articulated by the state and the 1983 Ordinance itself is a type contemplated by the state. Thus, enactment of the 1983 Ordinance is exempt from the antitrust laws by virtue of the state action doctrine.

Plaintiffs are willing to assume that the state has delegated broad authority to regulate condominium conversions, Plts' Supp. Memo in Opp. to Summary Judgment at 3, but argue that enactment of the 1983 Ordi-

nance cannot be protected by the state action doctrine because, "There is no way that the California Legislature contemplated, in the Subdivision Map Act or *any* of its statutes, the Mayor Feinstein would agree with Flynn and Cook of TRI Realty, one of plaintiffs' principal competitors, that San Francisco's condominium ordinances would be amended 'specifically to prohibit' the conversion of the John Muir." *Id.* at 4 (emphasis in original). But after *Llewellyn* this argument is unavailing. As discussed above, the Ninth Circuit has now made clear that questions of alleged agreements and alleged bad motives are not relevant to state action exemption analysis. The relevant question is whether the 1983 Ordinance is the type of condominium regulation contemplated by the state in its delegation of authority to the City and the ordinance certainly meets this objective test.

For these reasons, further discovery by the plaintiffs' concerning defendants motivations or agreements defendants might have reached regarding passage of the 1983 Ordinance is not appropriate. As a matter of law, enactment of the 1983 Ordinance is protected by the state action exemption and on that ground defendants City and County of San Francisco are entitled to summary judgment.

### III. The Local Government Antitrust Act of 1984.

Defendants have also renewed their motion for summary judgment based on the Local Government Antitrust Act of 1984. This legal question was analyzed in detail in the Special Master's Memorandum of April 25, 1985, but a ruling was postponed. Now, in view of the disposition of defendants' motion for summary judgment on state action exemption grounds, it is unnecessary to reach the question of retroactive application of Section 3(a) of the Act to this case.

### IV. Conclusion and Order.

For the foregoing reasons, IT IS HEREBY ORDERED that defendant City and County of San Francisco's motion for summary judgment is GRANTED.

Dated: December 31, 1985.

/s/ Thomas M. Jorde
THOMAS M. JORDE
Special Master